Filed 6/4/14  In re Charles N. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re CHARLES N., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br>        Plaintiff and Respondent,<br>v.<br>CHARLES N.,<br>        Defendant and Appellant. | A138332<br><br>(Contra Costa County<br>Super. Ct. No. J1201417) |

In this Welfare and Institutions Code section 602 proceeding, the juvenile court adjudged minor Michael N.[1] a ward of the court and ordered him to complete a residential sex offender treatment program after it sustained two counts of committing a lewd and lascivious act on a minor under the age of 14 in violation of Penal Code section 288, subdivision (a).  Michael appeals from the dispositional order, asserting the following four arguments:  (1) the juvenile court failed to find that he understood the wrongfulness of his conduct, as required by Penal Code section 26(One); (2) the juvenile court's finding of intent to gratify lust was unsupported by substantial evidence; (3) the

---

[1] Although the minor's first name is Charles, he apparently goes by his middle name, Michael.  For purposes of consistency with the proceeding below and the briefing on appeal, and to avoid confusion with his older brother who is also named Charles, we will refer to the minor as Michael.

1

questioning by the prosecutor and the court of one of the victims violated Michael's federal constitutional right to due process; and (4) the dispositional order placing Michael in a residential sex offender treatment program away from his family violated his right to due process. We conclude Michael's arguments lack merit, and we affirm the dispositional order.

## EVIDENCE AT THE JURISDICTIONAL HEARING

In July 2012, sisters C.R., who was five years old, and L.R., who was six years old, lived in a house in Hercules with their mother, Amy Y., their three-year-old brother, and multiple other relatives, including their 13-year-old cousin Michael.[2] On the evening of July 27, Amy went to work, leaving her mother and aunt in charge but asking Michael to keep an eye on and feed her three children. The aunt wanted to go to a party, so she paid Michael $5.00 to watch the children and put them to bed.

After Michael fed the children dinner, he sat down with them and his younger brother to watch television. The five of them then went into the bedroom the three children shared with their mother and played hide-and-go-seek. When it was time to go to sleep, the three children all climbed into the bed and tried to settle down, but they were very excited because they were going to an amusement park the next day. Michael stayed in the room to put the children to sleep, while his younger brother apparently left.

According to L.R., as she was lying in bed with her siblings, Michael reached over and touched her with his finger under her pajama bottoms. Later, on a diagram, she circled her genital area—where she goes "pee"—to identify where he touched her. It hurt and she told him to stop. She then saw Michael do the same thing to C.R. When C.R. told Michael to stop, L.R. pushed him out of the room and locked the door. The three siblings then went to sleep.

C.R., who was still five years old at the time of the jurisdictional hearing, testified that she remembered the night Michael was watching her and her siblings while their mother was at work. Something happened that she did not like very much, and she also

---

[2] The father of the three children, Brandon R., had separated from their mother about a week earlier and was living at a friend's house.

2

saw Michael do something to L.R.  While she would not verbalize what she saw, she repeatedly touched the vaginal area of a doll with a pen.  After attempts by the prosecutor to elicit a description of what happened without C.R. verbalizing a response, counsel for Michael interjected that "I think we're done.  For the record we've had no response for quite a while."  Just as the prosecutor and court agreed the questioning was done, C.R. stated, "He touched it," pointing to her vaginal area.  When asked who touched it, she pointed to Michael.

Two days after the incident, Brandon took his three children to the park and out for ice cream.  As they were eating their ice cream cones, C.R. told her father she did not want to go home.  When he asked her why, she responded, "Michael touched me the other night."  Brandon asked where he touched her, and she responded, "He touched me on my private area, Dad."  Brandon asked for details about what happened, and C.R. described how Michael had been in their bedroom and had put his hand in her underpants and touched her in her private area.  She told her father that Michael had said he was just patting her on her bottom, and she corrected him, telling him, "No, you're not," that he was putting his hands down the front of her underwear.

Brandon asked L.R. if Michael had done this, and she initially answered that he had touched her, too, expressing concern that she was going to get in trouble.  When he asked L.R. if Michael had really touched her, she said he had not, that it had only happened to C.R.  She later told her father that Michael did in fact put his hand down her underpants when she was lying in bed with her siblings.  She told him that she had retracted what she said initially because she was afraid she was going to get in trouble.

After learning what Michael had done, Brandon became extremely angry, immediately driving to the house so he could tell Amy's mother (Michael's aunt) what had happened.  When he told her Michael had touched C.R., she did not want to hear it, punching him twice in the face instead.  He left with his three children and went back to his friend's house.  He called Amy, who left work and met them at the house.  Once there, she took C.R. into a separate room and asked her what had happened.  Her daughter told her Michael touched her under her clothes "down there" and she told him it

hurt. She claimed the same thing had happened to L.R. When Amy asked L.R. if Michael had touched her, she said no.

Amy took C.R. to the Hercules police department that evening. Later that same night, she moved with her children to San Bruno, never to return to the house in Hercules.

Michael testified to a different version of the incident. According to him, after he cooked dinner, his aunt asked him to watch the three children. He was not happy about it, but he agreed. He watched television with his younger brother and the children, and then they all went into the bedroom the children shared with their mother to play hide-and-go-seek. At some point, Michael's older brother, Charles, came into the room and said it was time for the children to go to bed. Michael tried to put them to bed, but "they were all hyper and stuff." To get them to go to sleep, he "patted their butt like what we usually do."

Michael recalled telling a police officer that he accidently patted C.R. in the front of her body, testifying, "When I was patting her butt she started moving, and she turned around and accidently pat her [*sic*]." She turned over, and he continued to pat her bottom because he knew she was still awake. He left when he thought all three children were asleep. Michael also recalled the officer asking him if his hand might have gone down C.R.'s pants when she was wiggling around, but he did not remember nodding in response to that question.

On cross-examination, Michael claimed that the girls had asked him to pat their bottoms because that was what their grandmother did. He said that C.R. moved when he was patting her bottom, and "[w]hen she did that, my hand accidently, like, touched her pants at the thigh, and then I took my hand out . . . ." When asked what his hand was in, he answered that it was on her thigh, above her pants. He denied that he ever put his hand into C.R.'s or L.R.'s pants or touched either of the girls' vaginas, agreeing that it would have been wrong if he had done so because it would have been a sexual act.

4

Michael also testified he was a "little" scared of Brandon, who whipped him with a television cable when he was five, an allegation Brandon denied. Michael also claimed to have seen Brandon hurt C.R. and L.R.

### Children's Interview Center Interviews

Within a week of the incident, C.R. was interviewed at the Children's Interview Center (CIC). After a series of preliminary questions, C.R. volunteered that she was not lying when she said her cousin had hurt her. After a lengthy exchange about telling the truth, the interviewer asked whether C.R. was talking about Michael when she said her cousin had touched her. C.R. responded affirmatively. The interviewer asked C.R. to tell her everything that happened when Michael "did that to" her, and she described how when her mother was at work, she was in her mother's room with her sister and brother. They were lying down on the bed trying to go to sleep, and then "he did that to me." She told him to stop but he did not listen. According to C.R., Michael did it to L.R. as well. When asked to show the interviewer where Michael touched her, C.R. responded, "Yeah, not in the hole. Only in the peck peck," poking the vaginal area on a stuffed bear. According to C.R., he put his hand inside her underwear and "poked" her "peck peck"— what she uses "to [p]ee''—until it hurt. She told him to stop, but he said, "Shh, don't tell anybody" because he did not want them to get in trouble, and he pushed her on the shoulders and put his hands on her neck to keep her from telling anyone. She also saw him touch L.R.'s "peck peck" and heard her tell him to stop, which he finally did. C.R. said that she told her father Michael touched her on her "peck peck" and she told him to stop but he continued to touch her.

C.R. also told the interviewer that on a different occasion, when she was four years old, Michael did "that" to her while her mother and father were at work and she was sleeping in his bedroom. He used his pinky, which was sharp, and it really hurt. She told her mother, but she did not believe her.

A few weeks later, L.R. was interviewed at CIC. She began by telling the interviewer that Michael had done the same thing to her that he had done to her sister. Her mother was at work, and she was with her brother and sister in their mother's bed,

5

getting ready to go to sleep. Michael came into the room and was standing by the bed. L.R. saw Michael first touch C.R. "like that", and then he put his hand under the covers and touched L.R. under her nightgown and under her underwear in her "private part" that she uses to go to "pee." His hand was moving and it hurt. He said, "Don't tell anybody," and then she kicked him out of the room and locked the door

L.R. told the interviewer that at first, she did not tell anyone what happened because she was scared she was going to get in trouble. Her sister told their father, however, and L.R. finally told her mother the day before the interview.

### *Michael's Police Interviews*

Eleven days after the incident, Michael was interviewed by Hercules Police Officer Robert Pesmark. After waiving his *Miranda* rights, Michael agreed to speak with the officer. Officer Pesmark reviewed with Michael a *Gladys R.*[3] questionnaire, which contained questions asked of a juvenile under 14 years of age to determine whether he or she knows the difference between right and wrong. Michael answered the questions in a manner that indicated to the officer he understood right from wrong.

According to Officer Pesmark, Michael told him that on the evening of July 27, Amy was out working a night shift, and his aunt offered to pay him $5.00 to watch the children so she could go to a party. He agreed, even though he did not want to because he thought the children were bad. His older brother and another aunt were also home. At some point, Michael tried to tuck the children in and get them to go to sleep, but it was difficult because they were going to an amusement park the next day and were wound up. According to Michael, he patted the children on their bottoms because the girls asked him to do it and he felt it helped them get to sleep.

Officer Pesmark asked Michael if he might have patted something else, too. At first, Michael denied it, claiming C.R. was asleep when he was patting her bottom. When the officer asked why he was still patting her bottom if she was asleep, he changed his story, claiming that while he was patting C.R. on her bottom, she was wriggling around

---

[3] *In re Gladys R.* (1970) 1 Cal.3d 855.

6

and he might have accidentally patted the front of her.  He nodded in agreement when the officer asked if his hand accidently went in her pants.  Michael told the officer that when he realized his hand was in C.R.'s pajama bottoms, he removed it.  At other points in the interview, Michael stated that his hand was never inside her pants.  He denied having ever inserted his finger into either of the girls' vaginas.

Michael told Officer Pesmark that if he could change anything about the incident, it would be that his hand had not slipped.  The officer asked Michael if he felt sorry for what he did, and he said yes and wrote C.R. a letter of apology.  He indicated his understanding that it would be wrong to touch the girls in their vaginal area and that he would feel violated if someone touched his privates.

Officer Pesmark later interviewed Michael for a second time, after he learned that Michael may have also sexually abused L.R.  During that interview, Michael admitted he had accidentally touched C.R. but denied touching L.R.

## PROCEDURAL BACKGROUND

On October 5, 2012, the district attorney filed a two-count, Welfare and Institutions Code section 602 petition, alleging that Michael committed lewd and lascivious acts on C.R. and L.R., both of whom were under age 14, in violation of Penal Code, section 288, subdivision (a).

A contested jurisdictional hearing was held on December 6, 7, and 10.  After the court heard closing arguments, it sustained both counts, stating, "I do believe that the People have proven the petition—facts of the petition allegations beyond a reasonable doubt.  I don't see that these young girls—if they had been older, then I might have felt they would have been more suggestible, and more likely to make up stories, but in their case they're so young, and there was no evidence that the father actually did say or do anything to cause them to make up a story that wasn't true.  [¶] So, I am not happy to make this decision, but the evidence, I believe, does support the People's case beyond a reasonable doubt."

Michael retained Charles Flinton, Ph.D., to prepare a sexual offender specific psychological evaluation.  In conducting his evaluation, Dr. Flinton reviewed the records

7

in the juvenile court proceeding, conducted a mental status examination and a clinical interview, and completed two sex offender diagnostic evaluations: the juvenile sexual offender assessment protocol (JSOAP) and the juvenile sexual offender recidivism risk assessment tool (JSORRAT-II).

In his report, Dr. Flinton concluded that Michael presented a low risk for recidivism and showed no propensity toward violence, aggression, or general criminality. On the JSORRAT, Michael's score placed him in the low risk category. He did note that as to one particular component of the JSOAP—that being the "Intervention Scale"— Michael scored as a low to moderate risk, which Dr. Flinton attributed to Michael's continued denial of the offense. According to Dr. Flinton, however, this did not indicate that Michael was at a higher risk of reoffending, explaining, "An elevation on this scale may suggest that he will be slightly more resistant to treatment than offenders who admit their offense. I think that this score may falsely give the impression that he is at higher risk to offend than offenders who admit their offense. This is not the case. The reader should note that there is no evidence that denying an offense makes one at increased risk of sexual re-offense . . . . In most cases, the benefit of an offender admitting their offense is that the treatment provider can more accurately assess the offender's progress. In this particular case, if he did act inappropriately, the treatment provider should work toward accountability, possibly through the use of polygraph. Otherwise, the reader should note that his current denial does not increase his risk of sexual re-offense. In short, admitting or denying, Michael presents a low risk of sexual re-offense. This position is supported by the fact that he has fully cooperated with the legal system and to my understanding has not received any disciplinary actions while in Juvenile Hall. In addition, he presents aware of the wrongfulness of sexual misconduct and can articulate the consequences (many 13 year olds are unable to do this)."

Dr. Flinton recommended that Michael be placed in an outpatient sexual offender treatment program with, if appropriate, weekly group therapy designed for juvenile offenders. While Michael should not have contact with his victims, Dr. Flinton believed "removing him from his home is likely to cause harm to this generally high functioning

adolescent.  Living with his family, while participating in therapy, he can learn to behave in appropriate and prosocial ways."  Dr. Flinton specifically recommended Crossroads Psychotherapy as a treatment resource.

On March 19, 2013, Michael's counsel filed a disposition memorandum requesting that the court release Michael to his mother and require him to complete an outpatient treatment program as recommended by Dr. Flinton.  Counsel noted that since the incident, Michael's mother had relocated her immediate family to a new apartment and no longer maintained contact with the victims' family, so Michael could be reunited with his family without any risk of encountering the victims.  Further, she noted that in his time at Juvenile Hall, Michael had been a "model resident," achieving level one status, which she described as "the highest position and behavioral status that a minor can achieve," and earning all A's and B's in school.

Michael's counsel advised that Michael longed to return to his mother's care, having been separated from his family for over five months.  He was willing to attend a sex offender treatment program, engage in counseling, and abide by any conditions that would benefit his rehabilitation, all of which his mother would support.  Michael did not, counsel believed, need to be removed from his family to receive the services he needed and, according to Dr. Flinton, doing so would likely cause him harm.  She argued that he had proven by his exemplary behavior at juvenile hall that he was capable of following the court's orders and abiding by all terms imposed upon him.  Counsel further noted that this was Michael's first disposition, and he had had no prior contact with the juvenile justice system.

The probation department, on the other hand, recommended out-of-home placement in a residential juvenile sex offender treatment program.  According to the department, because Michael continued to deny the abuse, placement in the program was "necessary for the minor to accept responsibility for the offenses, and learn the cognitive behavioral skill set, in a semi-isolated setting to prevent him from re-offending."  Further, removal from the home would ensure the safety of Michael's siblings and other children in the community.

9

The probation department advised the court that Michael's mother and father[4] both believed he was innocent, with the mother indicating that her cousins, whom she believed to be drug addicts, had fabricated the allegations. The probation department was of the opinion that treatment would not progress well without full acceptance of responsibility, explaining, "If the minor remains at home with a parent, who denies his participation in the offense, then . . . Michael will not receive the consistent message necessary for him to take full responsibility for the instant offense." The probation department also doubted that Michael would be closely supervised, because "supervision in this extended family is questionable, as evidenced by the mother of the young victims, who had to work until 3 am and left an 89 year old aunt in charge of her child. When the 89 year old aunt wanted to discharge her responsibility to care for the children so that she could go to a party, she instead foisted it upon the barely 13 year old minor, for a sum of $5.00." And other than relocating her family away from the victims, the mother took no steps, such as counseling or a sex offender assessment, to help Michael.

The probation department completed a JSORRAT-II evaluation of Michael, reporting that he received a score of 3, which put him in the "moderate-low range of risk for committing one or more future sexual offenses as a juvenile . . . ." The department noted that on the same assessment, Dr. Flinton scored him as a 1, which it contended was incorrect.

On March 21, 2013, in response to the probation department's report, Dr. Flinton submitted an addendum to his report, correcting the JSORRAT-II score from a "1" to a "3" and deleting an "aberrant paragraph" that did not belong in his report.

A contested disposition hearing was held on March 22, 2013, with Dr. Flinton the sole witness. He testified that he interviewed Michael and conducted a mental status examination. He also performed two evaluations: the JSOAP, which assesses dynamic variables related to assessing for treatment focus and risk, and the JSORRAT-II, which

---

[4] Michael's father lived in the Philippines but was in telephone contact with his family.

assesses recidivism risk. Based on his findings, Dr. Flinton concluded that Michael presented a low risk.

According to Dr. Flinton, the JSORRAT-II identified Michael as a low to moderate risk, but there were other factors that made him amenable to treatment. His continued denial of the offense was something that needed to be targeted in treatment, but it did not correlate with an increased likelihood of recidivism. Further, according to Dr. Flinton, research has shown that "often the best and most successful clients in [a treatment] program are people who are initially denying." In Dr. Flinton's opinion, denial of the offense is not a reason to increase the intensity of treatment.

Dr. Flinton recommended an outpatient treatment program for Michael. As to why, he explained, "[F]irst and foremost, I don't see a large antisocial pattern. He's in a facility now and he is cooperating. He's been doing well with the structure. That structure can be somewhat replicated in the community. He can be contained in the community. There's strategies that probation and treatment providers use to monitor behavior. And in addition, a majority of the research shows that when we have low risk, low antisocial clients, that their behavior will worsen. They may actually develop more antisocial criminal attitudes if they're put in with higher risk more conduct disordered adolescents. [¶] So there's also some evidence that shows that low-risk individuals, which even the Probation Department acknowledges there's kind of a low/moderate risk, after treatment they had more criminal justice contacts than those people who just went on probation. There's also higher evidence of substance abuse, antisocial behavior, depression and suicide attempts."

In terms of family treatment, Dr. Flinton stated that Michael seemed to be responding well to structure, so it would likely benefit him to replicate that in the community where he would receive positive support from the people who care for him. This would entail family and individual therapy. He also recommended monitoring by a team comprised of the treatment provider, the probation officer, and a representative from Victim Advocacy. Dr. Flinton acknowledged that there was "some family dysfunction in the past," but he felt there was sufficient "pro-social structure" in the family that it would

11

be detrimental to separate Michael from his family, when they could be treated together. He also considered it significant that Michael's family and the victims' family had moved apart and were no longer in contact.

Dr. Flinton disagreed with the probation department's recommendation for residential treatment because Michael was not a high enough risk. As he explained it, "There's not a clear pattern of antisocial behavior, and particularly there's not a clear pattern of sexual misconduct. It appears that that would be too strong of a dose, so to speak." And, Dr. Flinton testified, studies have shown that treatment of excessive duration and intensity can be harmful.

On cross-examination, the prosecutor challenged certain subjective criteria on which Dr. Flinton based his JSOAP evaluation, and elicited a concession by Dr. Flinton that he had erred with respect to one particular category in the evaluation.

After closing argument by both counsel, the juvenile court adjudged Michael a ward of the court and ordered him placed in an residential treatment program.

Michael filed a timely notice of appeal.

## DISCUSSION

### I. The Juvenile Court Was Not Required to Make an Express Finding That Michael Knew the Wrongfulness of His Conduct

As relevant here, Penal Code section 26 states: "All persons are capable of committing crimes except those belonging to the following classes: [¶] One—children under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness. . . ." Reading into this statute a requirement that the juvenile court make an express finding that the minor knew of the act's wrongfulness, Michael argues the judgment must be vacated because the juvenile court here made no such finding. We disagree.

In claimed support, Michael cites only one case: the recent California Supreme Court opinion in *People v. Cottone* (2013) 57 Cal.4th 269 (*Cottone*). It is unavailing. There, defendant Cottone—an adult—was tried on charges of committing lewd acts on a child under 14 years old. (*Id.* at p. 277.) Prior to trial, the prosecution moved, pursuant

to Evidence Code section 1108, to introduce evidence that when he was 13 defendant had sexually abused his younger sister. (*Id.* at p. 278.) Defendant opposed the motion on multiple grounds, including that because he was under the age of 14 at the time, he was presumed incapable of committing a crime. The trial court found by clear and convincing evidence that, given his age at the time (13 years, 10 months) and the circumstances of the incident, defendant understood the wrongfulness of his conduct. It therefore allowed his sister to testify about the incident at trial. (*Ibid.*)

The Supreme Court considered a number of issues, including whether Penal Code section 26(One) applies to evidence admitted under Evidence Code section 1108. (*Cottone, supra,* 57 Cal.4th at p. 280.) It provided a brief overview of the statutes and legal principles relevant to that issue—quoted by Michael in his opening brief—as follows:

"We have long held that a finding of capacity is a prerequisite to an adjudication of wardship for a minor under 14. (*In re Gladys R.*[*, supra,*] 1 Cal.3d [at p.] 867.) The prosecution may rebut Penal Code section 26(One)'s presumption of incapacity by producing ' "clear proof" ' that the minor appreciated the wrongfulness of the conduct when it was committed, 'as demonstrated by [the child's] age, experience, conduct, and knowledge . . . ." [Citation.] 'Clear proof' in this context means clear and convincing evidence. [Citation.] While knowledge of wrongfulness may not be inferred from the act alone, ' "the attendant circumstances of the crime, such as its preparation, the particular method of its commission, and its concealment" may be considered. [Citation.] Moreover, a minor's "age is a basic and important consideration [citation], and, as recognized by the common law, it is only reasonable to expect that generally the older a child gets and the closer [he] approaches the age of 14, the more likely it is that [he] appreciates the wrongfulness of [his] acts." [Citation.]' [Citation.]

"Although Penal Code section 26(One) requires the prosecution to prove that a minor under 14 understood the wrongfulness of his conduct, capacity is not an 'element' of the underlying offense that must be proved beyond a reasonable doubt. [Citation.] Rather, the presumption of incapacity operates to exempt the minor from legal

13

responsibility. [Citations.] In this respect, capacity is similar to the issue of sanity, which is not a fact material to guilt but is a ' "prerequisite to a valid judgment and sentence." ' [Citation.] Accordingly, the prosecution need not rebut the presumption of incapacity beyond a reasonable doubt. Instead, it must satisfy the distinct standard of proof by clear and convincing evidence." (*Cottone, supra,* 57 Cal.4th at pp. 280–281.)

Against this background, the *Cottone* court held that "the presumption of incapacity set forth in Penal Code section 26(One) applies when the prosecution seeks to prove that the defendant committed an unadjudicated sexual offense before reaching age 14." (*Cottone, supra,* 57 Cal.4th at p. 281.)

From the foregoing, Michael extrapolates a requirement that the juvenile court make an express finding of capacity. But, as is evident from the above passages, *Cottone* did not hold that an express finding was necessary, nor was that even the issue before it. Under the procedural posture there, it was necessary for the trial court to make an express finding concerning defendant's understanding about the wrongfulness of his conduct because, as the court put it, it was a "foundational question to the admissibility of evidence proffered under section 1108." (*Cottone, supra,* 57 Cal.4th at p. 281.) Here, there was no such question before the court, and we see nothing in *Cottone* requiring an express finding on the issue of capacity.

*In re Gladys R., supra,* 1 Cal.3d 855, which the *Cottone* court cited to support its statement that "a finding of capacity is a prerequisite to an adjudication of wardship for a minor under 14" (*Cottone, supra,* 57 Cal.4th at p. 280), likewise does not require an express finding of capacity. It merely affirmed that "in order to become a ward of the court under [Welfare and Institutions Code section 602], clear proof must show that a child under the age of 14 years at the time of committing the act appreciated its wrongfulness." (*In re Gladys R., supra,* 1 Cal.3d at p. 862.) And prior cases have recognized that an implied finding by the trial court is sufficient. (See, e.g., *In re Paul C.* (1990) 221 Cal.App.3d 43, 52 ["we conclude substantial evidence supports the juvenile court's implied finding that Paul knew the wrongfulness of his conduct"]; *In re Cindy E.*

14

(1978) 83 Cal.App.3d 393, 399 ["The record contains sufficient evidence to support the implied finding that appellant appreciated the wrongfulness of her acts."].)

Michael does not appear to argue in the alternative that if even the juvenile court impliedly found he understood the wrongfulness of his actions, the finding was unsupported by substantial evidence. (See *People v. Lewis* (2001) 26 Cal.4th 334, 379; *In re Jerry M.* (1997) 59 Cal.App.4th 289, 297–298 (*Jerry M.*); *In re Marven C.* (1995) 33 Cal.App.4th 482, 486–487; *In re Paul C., supra,* 221 Cal.App.3d 43, 52–54.) In an abundance of caution, however, we address the issue, and we conclude that there was substantial evidence of Michael's capacity.

"In determining whether a minor would be capable of committing a crime under section 26, the juvenile court must consider the child's age, experience, and understanding. [Citation.] A minor's knowledge of his act's wrongfulness may be inferred from the circumstances, such as the method of its commission or its concealment." (*In re Paul C., supra,* 221 Cal.App.3d at p. 52.) Here, during the jurisdictional hearing, Michael acknowledged that he understood it was wrong to sexually touch another child. He further acknowledged that it would have been wrong to touch his cousins' private parts because that would have been a sexual act. And he testified that he understood what a private area is, that there is a difference between appropriate and inappropriate touching, and that it would be sexually inappropriate for him to touch the vagina of a five- or seven-year-old girl because that is her private area.

Additionally, Officer Pesmark testified that during his first interview with Michael, he reviewed the *Gladys R.* questionnaire with Michael to determine if he knew right from wrong. The officer testified that Michael answered all of the questions in a manner that indicated he knew right from wrong.

Michael also expressed remorse to Officer Pesmark and wrote a letter of apology to C.R. Likewise, both victims revealed that after Michael touched them, he told them not to tell anyone. These actions evidence Michael's understanding of the wrongfulness of his conduct.

15

Lastly, as noted, age is an important consideration in determining a minor's knowledge of the wrongfulness of his or her actions. The closer the child is to the age of 14, the more likely it is that he or she understands the wrongfulness of his or her acts. (*In re Cindy E., supra,* 83 Cal.App.3d at p. 399 ["[A] minor's age is a basic and important consideration [in determining the minor's knowledge of wrongfulness] [citation], and, as recognized by the common law, it is only reasonable to expect that generally the older a child gets and the closer [he or] she approaches the age of 14, the more likely it is that [he or] she appreciates the wrongfulness of [his or] her acts."]; see also *People v. Lewis, supra,* 26 Cal.4th at p. 379 [same]; *In re Nirran W.* (1989) 207 Cal.App.3d 1157, 1161.) At the time of the incident, Michael was 13 years old, less than a year shy of when he would not have been presumed to lack the capacity to commit a crime.

## II. There Was Substantial Evidence Supporting the Court's Finding of Intent to Gratify Lust

As noted, the juvenile court sustained two charges of violating Penal Code section 288, subdivision (a), which makes it illegal to "willfully and lewdly commit[] any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ." A violation of this provision "requires the specific intent of arousing the sexual desires of either the perpetrator or the victim." (*Jerry M., supra,* 59 Cal.App.4th at p. 299.) Michael submits the prosecution failed to prove beyond a reasonable doubt that he acted to gratify his own lust—as opposed to acting out of mere curiosity—such that the jurisdictional order must be vacated. Reviewing Michael's contention for substantial evidence (*In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1328; *In re Jose R.* (1982) 137 Cal.App.3d 269, 275), we conclude his claim lacks merit.

*In re Randy S.* (1999) 76 Cal.App.4th 400 (*Randy S.*) rejected a claim similar to that asserted by Michael. There, 11-year-old Randy admitted to his stepmother that he had inserted his fingers into his two-year-old stepsister's vagina while in the shower together, an admission he later retracted when questioned by a sheriff's deputy. (*Id.* at

16

pp. 403–404.)  Like here, the juvenile court found that Randy committed a lewd act upon a child in violation of Penal Code section 288, subdivision (a) and adjudged him a ward of the court.  (*Id.* at p. 402.)

On appeal, Randy contended there was insufficient evidence that he intended to arouse sexual desires, a contention based on the fact that he was 11 years old and prepubescent at the time, and there was a lack of evidence of sexual arousal.  (*Randy S., supra,* 76 Cal.App.4th at pp. 404–405.)  The majority disagreed.  It identified the circumstances relevant to the issue of whether the minor possessed an intent to arouse sexual desire as including "the nature of the charged act, physical evidence of sexual arousal, clandestine meetings, 'the defendant's *extrajudicial statements* [citation], other acts of lewd conduct admitted or charged in the case [citations], the relationship of the parties [citation], and any coercion, bribery, or *deceit* used to obtain the victim's cooperation or to avoid detection.' "  (*Id.* at pp. 405–406.)

The court found several factors that constituted sufficient evidence of intent to arouse.  First, when confronted by his stepmother and before she told him why she was upset, Randy volunteered, " 'I hope you don't think that I sexually abused [my stepsister].' "  Randy then admitted he had done so.  Second, on several prior occasions, Randy had requested but had been denied permission to shower with his stepsister, which, according to the court, evidenced an "unnatural interest" in showering with her.  Third, the incident was done in a clandestine manner.  And fourth, Randy told inconsistent stories, first admitting what he had done, later denying it, and finally, concocting a story that his stepsister had slapped her own genitals until she was red.  (*Randy S., supra,* 76 Cal.App.4th at p. 407.)  The majority concluded, "[W]e are convinced that the circumstances surrounding [Randy's] actions demonstrate that he harbored the requisite intent to arouse his own sexual desires through the use of [his stepsister].  Although he may only have been experimenting sexually, his actions clearly evidenced an intent to sexually stimulate himself."  (*Ibid.*)

Here, viewing the evidence, as we must, in the light most favorable to the judgment (*Randy S., supra,* 76 Cal.App.4th at p. 404), we likewise conclude substantial

17

evidence supports a finding of Michael's intent to arouse himself. Like Randy, Michael touched his cousins in a clandestine manner, in this case in a bedroom at night when their mother was at work and out of the presence of any adults. The manner of the touching—putting his hand inside the girls' pajama bottoms—is itself suggestive of a lewd motive. Michael told both of the girls not to tell anyone what he did. And, finally, Michael was 13 years old—close to the age of puberty—at the time of the crime.

Michael agrees that *Randy S.* is "on point," although he submits the dissent is better reasoned, urging us to follow it instead of the majority. We decline to do so. Dissenting Justice Gaut disagreed with the majority's interpretation of the evidence, conceding it showed "that Randy knew that what he did was wrong and that it was of a sexual nature," but arguing it did "not establish that he touched [his stepsister's] vagina 'with the intent of arousing, appealing to, or gratifying' his own 'lust, passions, or sexual desires.' " (*Randy S., supra,* 76 Cal.App.4th at p. 409.) According to Justice Gaut, there was "substantial evidence that Randy was a disturbed, angry, violent child who wanted attention and was hostile toward his stepsister," and he "had been rebelling and causing a lot of problems," circumstances that showed an act of defiance with no evidence of sexual motivation or gratification. (*Id.* at pp. 409–410.) Lastly, while acknowledging that age was not the sole determinative factor, Justice Gaut considered it "a very significant factor" in that case, "since Randy was 11 years old, whereas the age of puberty for boys is 14, and there is no evidence that Randy was capable of, or motivated by, sexual gratification or lust." (*Id.* at p. 410.) None of the factors that, in Justice Gaut's opinion, undermined a finding that Randy intended to satisfy his sexual desires—anger, hostility toward his stepsister, rebellion—existed here.

The second case on which Michael relies is *Jerry M., supra,* 59 Cal.App.4th 289. Such reliance is misplace—*Jerry M.* is distinguishable. There, 11-year-old Jerry touched the breasts of three young girls. Twelve-year-old Clair was with friends when Jerry approached the group and squeezed her breasts through her shirt. (*Id.* at p. 294.) A month later, he refused to return Clair's bike unless she showed him her breasts, which she ultimately did. Another girl, Stephanie, was standing near her apartment complex

18

mailboxes when Jerry touched her breasts, saying that they " 'grew' " and felt " 'good.' " Lastly, Jerry asked 12-year-old Sonia if she was "flat" and then put his hands under her T-shirt and bra and touched her breasts. (*Ibid.*) Jerry was charged with four violations of section 288, subdivision (a).

Relying largely on Jerry's age (11) and his prepubescence, the court held that the minor lacked the specific intent to sexually arouse himself. (*Jerry M., supra,* 59 Cal.App.4th at p. 300.) The court found it relevant that Jerry knew the victims and that his conduct was public, occurring in daytime and in the presence of others, such that there was no attempt or opportunity to avoid detection. No clandestine activity occurred, and the Jerry did not warn the girls not to tell anyone what happened. The minor's touching was momentary, without caress or an attempt to prolong the touching. The court concluded that "Jerry was a brazen 11-year-old whose conduct was more consistent with an intent to annoy and obtain attention than with sexual arousal." (*Ibid.*)

The sentiment underlying *Jerry M.* was that the natural, normal curiosity of a prepubescent child, even if inappropriately expressed, should not be criminalized. But several factors distinguish Jerry's harassing curiosity from what Michael did to his five- and six-year-old cousins. As detailed above, Michael touched the girls late at night out of the presence of any adults. He sought to hide his conduct by telling the girls not to tell anyone. He touched his cousins in a manner that caused them pain, which suggests it was more than a momentary or passing caress. And, again, at 13 years old, Michael was close to the age of puberty.

### III. The Questioning of C.R. Did Not Violate Michael's Right to Due Process

Michael's third argument concerns C.R.'s testimony at the jurisdictional hearing. He contends that "the prosecutor, the juvenile court judge, and the victim's mother, went too far in their efforts to coax, coerce, and cajole incriminating testimony from five-year-old" C.R. such that his constitutional right to procedural due process was violated. Because the manner in which C.R. was questioned is critical to this issue, we set forth her testimony at length.

19

### *C.R.'s Testimony*

Five-year-old C.R. was the first witness called to testify. When she took the stand, counsel for Michael stated that "there may be an issue with [Amy] being in the courtroom" during her daughter's testimony because she, Michael's counsel, had subpoenaed Amy as a witness. The prosecutor responded that C.R. was allowed to have a support person, and that person was her mother. The court indicated that under the circumstances, it was going to allow Amy to remain, asking C.R. if she wanted her mother to stay with her. After C.R. answered, "Yes," the court continued:

"THE COURT:    Okay. And my name is Judge Judy. And we're going to be asking you some questions today, both the attorneys—I won't. But one thing I need to ask you is do you understand that you are required to be truthful, tell the truth when you're asked questions? Do you understand that?

"THE MOTHER:    You have to tell the truth. She's asking you if you understand. Just say yes. She's talking to you, honey.

"THE COURT:    Do you know what telling the truth means, not tell a lie?"

The prosecutor then began her direct examination, first asking C.R. if she could call her by her nickname, Cinderella. She then started off with preliminary questions unrelated to the incident, including C.R.'s age and grade in school, her favorite activity at school, whether she liked to play outside, and so forth. C.R. responded to most questions with a shrug, a nod, or shake of her head, despite efforts by the prosecutor to get her to respond with a "yes" or a "no." The prosecutor then asked her questions regarding telling the truth versus telling a lie, as follows:

"Q:    [S]o if I say my jacket was blue would that be—would that be a truth or a lie?

"A:    Lie.

"Q:    How come?

"A:    Because it's gray.

"Q:    Okay. Okay. Good. And is it better to tell a truth—the truth or a lie?

"A:    Truth.

20

"Q:   The truth.  Okay.  And how come?

"A:   Because it's good."

After that, C.R. reverted to nonverbal responses, so the court took a brief break to allow the prosecutor and Amy to talk to C.R.  Questioning then resumed, with C.R. holding her mother's hand.  The prosecutor moved on to a series of questions about various body parts, which questions C.R. mostly answered.  Showing C.R. a diagram of a girl, she sought to elicit responses about what C.R. called various female body parts.  C.R. reverted to nonverbal responses, so the prosecutor suggested that the child sit on her mother's lap, in exchange for an agreement that she would say "yes" or "no" instead of nodding her head.  Questioning then resumed as follows:

"Q:   So do you remember did you ever live in the same house with your cousin Michael?

"A:   Yes.

"Q:   Okay.  And do you remember the time when he stayed with you and your sister and your brother when your mom went to work and he made you lasagna for dinner?

"A:   Yes.

"Q:   Okay.  And do you remember were you at some point that night were you going to bed in mom's bed?

"A:   (Nodding head.)

"MS. EISENHART [COUNSEL FOR MICHAEL]:  Your Honor, I would object to leading.  I think these questions could be a little more open.

"THE COURT:    Well, I think this is preliminary.  That's okay.  Overruled.

"MS. DELAHUNT [THE PROSECUTOR]:    Okay.  So do you remember did he do anything that you didn't like.

"A:   (Shrugging.)

"MS. EISENHART:    Objection.  Leading.

"A:   I don't know.

21

"Q:    Okay.  All right.  Do you—let's go back to your picture.  Okay.  Ready to draw for me a little bit?

"A:    Mm-hm.

"Q:    So will you circle the hand for me?

"A:    (Witness complies.)

"Q:    Good.  All right.  What—

"A:    A check.

"Q:    Good.  You got that one right.  Can you circle the foot for me?

"A:    (Witness complies.)

"Q:    You like to check.  Okay.  Okay.  Good.  And can you circle the tummy?  Where's the tummy?

"A:    (Witness complies.)

"Q:    Good girl.  Okay.  Can you circle—what's that part right here, can you circle that part and tell me?

"A:    (Witness complies.)

"Q:    Check.  What words do you use for that part?  Do you have a word that you use with mom for that part?  What does mom tell you?

"A:     I don't know.

"Q:     You don't know.  Okay.  Is that where—is that where the pee comes out of—or the pee?  Okay.  Okay.  And so when I talk to you about that part, what word would you recognize if I call it?  Can I call that—can I call that your peck-peck?

"MS. EISENHART:   Objection.  Leading.

"THE COURT:    Well, she's asking if she can, so overruled.  I'm sorry.  Go ahead.

"C.R.:   I don't know.

"THE COURT:    What do you call that, honey?

"MS. DELAHUNT:    It's okay.  You can't get in trouble here.  No one is going to get—you're not in trouble.  You can say—

"C.R.:   I don't know.

22

"MS. DELAHUNT:    —whatever you want.

"C.R.:    I don't know.

"THE COURT:    You don't know.  Okay.

"MS. DELAHUNT:  Okay.  [¶] Well, let me ask you, um, then maybe when we talk about this part—okay, I'm going to call that—

"A:    I don't know.

"Q:    You don't know.  Okay.  Well, let me ask you, okay.  So tell me, you said at one time, okay that you guys were all living together with mom and L.R. and [your brother] and the grandma.  Who else was living at your house?

"A:    Grandpa.

"Q:    Okay.  And did you—let me ask you, did your cousin Michael live there, too, for a little bit?  Yes or no?

"A:    Yes.

"Q:    Okay.  So had—and can you tell me yes or no.  Okay.  Um, but just give us words yes or no.  Okay.  So did anything—when you were living in the house with everyone did anything happen that you didn't like very much?

"A:    I don't know.

"Q:    You don't know?

(Witness shakes head.)

"Q:    Okay.  Is that the truth?

"A:    I don't know.

"Q:    Okay.

"A:    I forgot.

"Q:    You forgot?  Okay.  Um, do you—C.R., do you remember ever talking to your dad about maybe something that happened that you didn't like?

"MS. EISENHART:    Objection.  Leading.

"C.R.:    Yes.

"MS. DELAHUNT:  Okay.

"THE COURT:    Overruled.

23

"MS. DELAHUNT: Okay. So can you tell us—and I know, C.R., I know it's hard, but here's the thing after we're done—

"THE COURT: No, don't. Just ask her questions.

"Q: Okay. C.R., tell me—okay. So you remember talking to your dad, right? Here, I'm going to take the marker for now.

"A: Yes.

"Q: Yes. Okay. And why—do you remember when your dad picked you up and you didn't want to go back to the house?

"MS. EISENHART: Objection. Leading.

"THE COURT: Leading. Let's don't lead now that you're getting into—

"Q: Okay. So, C.R., let's talk about something easy for a minute. Okay. Okay. So tell me—so we were talking about your favorite thing to do at school. What do you like to do at school? I don't think you ever told us. Can you tell us now? There must be one thing that you like at school.

"A: Playing with my friends.

"Q: Okay. All right. And I know I asked you before, but can you tell me now what's your favorite movie? Do you have a movie that you like?

"A: Cinderella.

"Q: Just like your name. Oh, good. Okay. So and I told you—remember Judge Judy introduced herself to you, yeah?

"A: Yes.

"Q: Okay. Okay. And so Judge Judy has to decide if something happened that you didn't like very much. Okay. So—

"A: Yes.

"Q: Okay. So what I need you to do is if anything happened that you didn't like very much when you were at the house, okay, can you just tell us in any words that you can what happened?

"A: I still forgot.

"Q: You still?

24

"THE COURT: She still forgot.

"MS. DELAHUNT: Okay.

"A: I forgot."

At that point, the prosecutor decided to call L.R. to testify, and recall C.R. at a later time.

After her older sister testified, C.R. was recalled to the stand and gave the following testimony:

"MS. DELAHUNT: Remember Judge Judy? Yeah. Okay. All right. So I'm just going to ask you a few question [*sic*]. All right?

"A: Yes.

"Q: Okay. All right. So do you remember when you were staying with your grandma?

"A: Yes.

"Q: Okay. And who was staying at the house with you? Was your cousin Michael staying there, too? Is that a yes or no?

"A: Yes.

"Q: Okay. Do you remember when your mom had Michael stay with you and L.R. and [your brother]?

"A: Yes.

"Q: Okay. And did something happen that you didn't like very much?

"A: Yes.

"Q: Okay. Can you tell us in your words what happened? Okay. Let me ask you do you remember when Michael put you to bed?

"A: (Nodding head.)

"Q: Yes or no?

"A: Yes.

"Q: Okay. And were you wearing pajamas?

"A: Yes.

"Q: Okay. What pajamas were you wearing?

25

"A:    Um, Dora.

"Q:    Dora.  Okay.  Was it like pants and a top?

"A:    Mm-hm.

"Q:    Okay.  And was your sister L.R. there, too?

"A:    Mm-hm.

"Q:    How about [your brother], was he with you?

"A:    Mm-hm.

"Q:    Okay.

"THE COURT:    Is that a yes?

"A:    Yes.

"THE COURT:    Yes.  Thank you.

"MS. DELAHUNT:    And do you remember were you all in mom's bed together?

"A:    Yes.

"Q:    Okay.  And did Michael ever come in?

"A:    He did.

"Q:    Okay.  And what did he do when he came in?

"A:    Um—

"Q:    It's okay.  You can tell us what happened.  It's okay.

"A:    I don't know.

"Q:    Did you ever see—did you ever see Michael do anything to L.R. that you didn't like?

"A:    Mm-hm.

"Q:    Okay.  What did he do to L.R. that you didn't like?  Did he—did you ever tell—do you remember telling your dad that something happened?

"A:    Yes.

"MS. EISENHART:    Objection.  Leading.

"THE COURT:    Overruled.

"Q:    Okay.  And did you go—after you told your dad did you go back to the house any more?

26

"A:    No.

"Q:    How come?

"A:    I had—

"Q:    How come?

"A:    He—

"Q:    Okay.  I'm going to ask you one more time.  Okay?

"A:    Mm-hm.

"Q:    Okay.  Can you tell me when you went to bed with L.R. and [your brother] did Michael come in?

"A:    (Nodding head.)

"Q:    Can you give me a yes or no?

"A:    Yes.

"Q:    And can you tell me did he do something you didn't like too much?

"MS. EISENHART:    Objection.  Leading.

"THE COURT:    Well, I think you have already asked that question several times.

"Q:    Can you tell us—okay, C.R., I'm going to ask you just one more time. Okay.  And you're not going to get in trouble so you can tell us if anything happened. Okay.

"Are you pointing to something?

"A:    (Indicating.)

"Q:    Okay.  What are you pointing to?

"A:    (Indicating.)

"Q:    Okay.  Can I get that?  Okay.  All right.  Oh, then let me give you your pen back.  Can you circle for me what the part you just pointed to on you?

"A:    (Indicating.)

"Q:    Okay.  And do you—what happened there?  Did something happen there?

"A:    (Nodding head.)

"Q:    Is that a yes?

"A:    Yes.

27

"Q:    Okay.  And can you tell us what happened?  Did you ever get hurt there?

"MS. EISENHART:    Objection.  Leading.

"THE COURT:    It is but I'll overrule it for now.  But don't ask leading questions, please.

"Q:    Okay.  So C.R., you said you saw Michael do something to L.R.  What did you see him do?

"A:    (Indicating.)

"Q:    Okay.  What did you see him do to that part that you circled?

"A:    (Indicating.)

"Q:    And that's the same part you're pointing to, right?

"A:    Mm-hm.

"Q:    Okay.  Um, what did he do?  Do you want to show me?  Um, do you want to show me on yourself what he did?  Okay.  What did he—what are those?

"A:    Hands.

"Q:    Okay.  Okay.  What—you pointed and you circled here, right?

"A:    Mm-hm.

"Q:    Did anything happen to have that—to that part that you didn't like?

"MS. EISENHART:    Objection.

"THE COURT:    Sustained.  Can you tell us what happened?

"A:    Um—

"Q:    So the judge is like—she's like your teacher at school, right?

"A:    Mm-hm.

"Q:    When someone gets in trouble at school sometimes do you tell the teacher what happened?

"A:    Mm-hm.

"Q:    Okay.  So that's kind of like what Judge Judy is.  So if something happened that you want to tell her, you know, that's what you're here to do.  So can you tell Judge Judy what happened?  See her right over there.

"THE COURT:    I'm ready to listen.  My ears are open.

28

"Q: We don't understand what that means. We need words. Tell us in words. Okay. Can you just tell the judge?

"A: (Indicating.)

"Q: I see you—you're for the record on the doll the vaginal area she's touching repeatedly with a pen. Okay.

"Can you tell the judge in words what happened with that? Just one time and then we're done.

"MS. EISENHART: Objection. Asked and answered.

"Q: We only understand words. I don't know what that means.

(Brief pause.)

"Q: No words? Okay. Not going to tell us. I know you talk well. You told us a lot of good things today. Your nickname you told us is Cinderella. You told us your—okay. You can see Judge Judy better. All right. Okay.

"THE COURT: Now can you tell us what happened?

"MS. DELAHUNT: She's really nice, Judge Judy. She won't get mad. No matter what you say she won't get mad. I promise no one's going to get mad.

"MS. EISENHART: Your Honor, I think we are done. For the record, we've had no response for quite some time.

"THE COURT: Okay.

"MS. DELAHUNT: All right.

"THE COURT: Okay.

"MS. DELAHUNT: We're done.

"THE COURT: One last chance to tell us.

"MS. DELAHUNT: I think we're done.

"A: He touched it.

"THE COURT: He touched where?

"A: (Indicating.)

"MS. DELAHUNT: Right there?

"A: Mm-hm.

29

"Q: Okay.

"THE COURT: Do you have any questions?

"MS. EISENHART: Sure.

"MS. DELAHUNT: Can I ask one more, Your Honor?

"THE COURT: Okay.

"MS. DELAHUNT: Okay. Who is he?

"A: (Indicating.)

"Q: Okay. So for the record the witness has identified—can the record reflect the witness identified the minor?

"THE COURT: Yes."

### The Questioning of C.R. Was Not Improper

Michael complains that the manner in which C.R. was questioned maximized her suggestibility, rendering her testimony so unreliable that it violated his right to due process. The People dispute this claim on the merits, but also object that Michael forfeited this claim by failing to raise it below. We first address the issue of forfeiture.

As the People correctly note, Michael never objected below to the admission of C.R.'s testimony on the ground that the prosecutor or the court acted improperly such that he was deprived of due process. It is well established that " ' "questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." ' " (*People v. Alvarez* (1996) 14 Cal.4th 155, 186; Evid. Code, § 353.) This rule extends to claims of constitutional violations. (*People v. Raley* (1992) 2 Cal.4th 870, 892; *People v. Benson* (1990) 52 Cal.3d 754, 786, fn. 7; *People v. Gordon* (1990) 50 Cal.3d 1223, 1240, fn. 2.) In reply, Michael identifies various objections he made throughout C.R.'s testimony—for example, to leading questions and to the presence of C.R.'s mother in the courtroom. But Michael never raised a due process objection. We therefore conclude he forfeited this argument.

30

Even if we were to reach the merits, however, we would still reject Michael's due process claim, because the record does not support his contention that the conduct of the prosecutor and the juvenile court rendered C.R.'s testimony unreliable.

In advancing this argument, Michael relies heavily on the New Jersey Supreme Court's opinion in *State v. Michaels* (1994) 136 N.J. 299, which he describes as "[t]he leading case" on "the suggestibility of child witnesses, and the impact such suggestibility may have upon the reliability of child molestation trials." There, the court discussed at length the "improper interrogation[ techniques that] generate a significant risk of corrupting the memories of young children" in child abuse cases, and agreed "that the use of coercive or highly suggestive interrogation techniques can create a significant risk that the interrogation itself will distort the child's recollection of events, thereby undermining the reliability of the statements and subsequent testimony concerning such events." (*Id.* at pp. 311-312.) While we do not disagree with the studies cited by the court or the court's conclusion, the record before us does not support Michael's claim that the prosecutor and/or the court used unduly suggestive interrogation techniques during C.R.'s testimony.

Michael lists a host of examples of what he contends was coercive conduct by the prosecutor. First, he notes that the prosecutor called C.R. "Cinderella," which he claims transformed the jurisdictional hearing into "fantasy play-land" and "removed the proceedings from the realm of reality to the realm of fantasy, and suggested that the witness could become a heroine, rising above her abusive domestic setting. The injection of this element of fantasy, followed by a series of irrelevant 'soft' questions about fun and Disney movies, dissipated the sobering effect of the courtroom setting which ordinarily encourages a child witness to tell the truth." Michael's imaginative description is not only theatrical and fanciful, but it is also not based in reality.

As C.R. told the CIC interviewer, her nickname is Cinderella. The prosecutor thus did not come up with that nickname out of whole cloth in some devious plot to create a princess fantasy. It appears obvious that she used the five-year-old child's nickname to help her feel at ease in a situation that is intimidating to even the most stalwart of adults.

31

As to the so-called "soft" questions that Michael finds so objectionable, these were generic, preliminary questions designed to acclimate C.R. to the court proceeding and to assess her ability to respond appropriately to questioning. For example, the prosecutor asked how old she was, what grade she was in, the name of her teacher, whether she liked school, her favorite activity at school, whether she liked to play outside, and whether she had a favorite movie. Nothing about this was improper.

Michael also takes exception to the prosecutor responding to C.R.'s answers with "good" or "good girl," suggesting that the prosecutor provided this positive reinforcement whenever C.R. gave an answer that she liked, to encourage more of the same. We fail to see anything objectionable about the prosecutor commenting "good" or "good girl" when, for example, C.R. circled a hand and then a foot on an anatomical diagram.

Nor was the practice of C.R. sitting on her mother's lap and holding her hand during the child's testimony improper. While Michael submits this practice "compounded maternal influence upon C.[R.]'s testimony," we glean no evidence of influence or attempted influence upon C.R. by her mother during C.R.'s testimony.

Further, a prosecuting witness in a case involving sexual abuse of a minor is entitled to the presence of two support persons at trial, one of whom may accompany the witness to the witness stand. (Pen. Code, § 868.5, subd. (a).) This includes a support person who is also a witness in the case. (*Id.*, subd. (b).) Indeed, the United States Congress has sanctioned this practice of allowing a minor testifying at a judicial proceeding to hold the hand and sit in the lap of an adult attendant. (18 U.S.C. § 3509(i).)

In seeking to persuade us of the impropriety of this practice, Michael cites a Hawaii case, *State v. Rulona* (1990) 785 P.2d 615, overruled on other grounds in *State v. Mueller* (2003) 76 P.3d 943, claiming the court there found it to be "error for [a] child witness to testify while seated in [an] adult's lap, because [the] arrangement encourages non-verbal communication between child and adult." As the *Rulona* court itself acknowledged, however, it did "not reach the question of whether there might be circumstances in which a court could permit a child witness to testify sitting in the lap of

32

an accompanying person," finding only that the practice was improper in the case before it because there had been no showing of a compelling necessity for the eight-year-old child to do so. (*Id.* at pp. 616–617.) We further note that many of the cases addressing the presence of a support person involve the impact the support person has on the jury. (See e.g., *People v. Patten* (1992) 9 Cal.App.4th 1718, 1730 and cases discussed there.) This was a jurisdictional hearing before a juvenile court judge, so there was no risk of jury prejudice.

Michael also contends that the prosecutor repeatedly posed the same questions to C.R., claiming, "The prosecutor in this case asked C. over and over again whether anything she did not like had happened. However many times C. testified that she recalled nothing untoward, the prosecutor returned to the same line of questioning. The only reasonable inference C. could draw was that her responses did not satisfy the prosecutor, the judge, or her mother." This was not the situation here, however. C.R. was obviously reluctant to verbalize answers to questions posed by the prosecutor. While C.R. ultimately answered "yes" or "no" to certain preliminary questions, she continued to shrug, shake or nod her head, or respond that she did not know or had forgotten in response to substantive questions. To the extent the prosecutor repeated certain questions about the incident, the record indicates they were asked in an effort to elicit a verbal yes, no, or description—not to coerce the witness into changing her answer.

In addition to attacking the prosecutor, Michael challenges the conduct of the judge. First, he contends she began "coddling and cajoling C. virtually from the moment she entered the courtroom" by asking if she wanted her mother there. This question arose in the context of the request by Michael's counsel that Amy be excluded from the courtroom because she had been subpoenaed as a defense witness. There was nothing "coddling" about the question, and it was consistent with the court's duty under Penal Code section 868.8 to "take special precautions to provide for the comfort and support of the . . . minor" who was testifying in a sexual abuse case.

More significantly, Michael claims the judge "abandoned her neutral stance and became an advocate." While he concedes she "commenced the hearing with the mindset

that she would try the case fairly"—a concession that seemingly contradicts his claims that the judge coddled and cajoled C.R. from the outset of the proceeding—he contends her neutrality disappeared as her "frustration level rose," to the point "she was eventually transformed into an overzealous prosecutor unwilling to accept a five year old's repeated statements that she did not recall being abused by her cousin." The veracity of this claim is belied by even a cursory review of C.R.'s testimony.

We do address, though, one specific example Michael cites of the judge's alleged advocacy, that is, her statement at the end of C.R.'s testimony that C.R. had "[o]ne last chance to tell us." According to Michael, this "outrageous" comment "assumed that there was something to tell, and . . . it suggested that telling was a wonderful opportunity which C. should not waste." Nonsense. C.R. had testified that the night Michael stayed with her and her siblings something had happened to her and L.R. that she did not like and that she had told her father about it. She had nonverbally indicated that something had happened to her private parts. The prosecutor asked her a series of questions in an attempt to get her to verbalize her response. In the absence of an answer, first defense counsel and then the prosecutor acknowledged they were "done" at that point, as it appeared that C.R. did not want to put into words what she was indicating with gestures. At that point, the judge offered C.R. one last chance to verbalize what she was gesticulating. This did not assume there was something to tell, as there clearly was: the child was gesturing her response but simply would not verbalize it. And we are confounded by Michael's claim that the judge's comment somehow conveyed to C.R. that she was being presented with some wonderful opportunity.

In short, there can be no doubt that C.R. was a reluctant witness. She was five years old and was being asked to testify about the sexual abuse she and her sister had suffered at the hands of their cousin. We cannot agree, however, that the proceedings were so suggestive and coercive as to render C.R.'s testimony unreliable.

Finally, we note that even if there was error, it was harmless. (*Chapman v. California* (1967) 386 U.S. 18.) C.R. was interviewed at CIC on August 2, 2012, less than one week after the incident, and the juvenile court reviewed a videotape of that

34

interview. During the interview, C.R. unequivocally described how Michael put his hand in her underpants and touched her genitals and how she saw him do the same thing to her sister. And L.R. testified that she saw Michael touch C.R. That evidence was clearly sufficient to support the juvenile court's findings.

Michael counters that evidence of the CIC interview was hearsay and did not fall within the scope of any exception to the hearsay rule. Although he contends the court reviewed the videotaped interview over defense counsel's objection, counsel did not in fact object on hearsay grounds, merely contending that the interviews were "cumulative since we've already had the testimony of the girls." In the absence of a hearsay objection below, Michael cannot assert it here.

## IV. The Juvenile Court Did Not Violate Michael's Right to Due Process By Placing Him In a Residential Treatment Program

In his final argument, Michael challenges his disposition, claiming the juvenile court violated his right to due process by ordering him placed in a residential treatment program away from his family. This is so, he reasons, because due process required that he be returned to the custody of his family absent a compelling interest in placing him out-of-home. The People counter that the juvenile court's disposition order is typically reviewed for abuse of discretion, and there was no such abuse here.

As a preliminary matter, we note that Michael again forfeited this claim by failing to assert a due process objection below. Further, Michael cites no authority supporting his theory that the "juvenile court may select a residential sex offender treatment program over an out-patient sex offender treatment program, only where a compelling interest justifies infringement of [*sic*] the delinquent's family's constitutional right to live together as a family." Rather, he cites general authority about the importance of the familial relationship and the necessity for the state to demonstrate a compelling interest before intruding on family unity. (See, e.g., *Lehr v. Robinson* (1983) 463 U.S. 248, 261; *Moore v. City of East Cleveland* (1977) 431 U.S. 494; *In re James R.* (2007) 153 Cal.App.4th 413, 429.) None of his cited authorities recognizes a due process right

35

to family unity in the circumstances here—where a minor has committed a serious criminal offense, and the juvenile court must determine what disposition is best for the minor's welfare and rehabilitation. Accordingly, in the absence of authority that the juvenile court's residential placement order is reviewable for a due process violation— and particularly given that Michael did not preserve any such claim—we review the court's disposition order here for abuse of discretion. (*In re Carl N.* (2008) 160 Cal.App.4th 423, 432; *In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329–1330.) And we conclude there was none.

The court had before it the probation report, Dr. Flinton's report, the probation department's supplemental report, Michael's disposition memorandum, and Dr. Flinton's testimony. While Dr. Flinton opined that Michael could be released to his mother while he completed an outpatient treatment program, the probation department disagreed. The department's primary concern was that Michael continued to deny any wrongdoing, and his parents believed him to be innocent. His mother blamed the false accusations on her supposedly drug-addicted relatives. The probation department believed that under these circumstances, "support for and reinforcement of the concepts taught in outpatient juvenile sex offender treatment would [be] non-existent. Even Dr. Flinton acknowledged that a persistent belief by Michael's parents that he did nothing wrong could be detrimental to Michael's treatment if he was in an outpatient program. It was not outside the bounds of reason for the court to agree with the department that in order for Michael to receive effective treatment, he could not remain under the same roof as someone who continued to deny his culpability.

The probation department was also concerned about Michael's contact with young children if he were returned home. While his family was no longer in contact with Amy's family, they remained in contact with other relatives who had young children. And Michael had a younger sibling who might have friends over.

Additionally, while Michael's mother told the probation department she closely supervised her children, the juvenile court could easily have concluded otherwise, given that Michael sexually abused his young cousins on a night when his aunt paid him $5.00 to watch the children so she could go to a party. And Dr. Flinton acknowledged that Michael's family was dysfunctional.

Finally, the probation department scored Michael in the moderate-low range of risk for committing one or more future sexual offenses as a juvenile. This supported the court's decision that a residential treatment program would best serve his needs. Michael makes much of Dr. Flinton's opinion that Michael should be returned to his mother's care and treated in an out-patient program. The court was not obligated to follow Dr. Flinton's recommendation, however, and it could "disregard those recommendations for nonarbitrary reasons." (*People v. Sword* (1994) 29 Cal.App.4th 614, 629.) The issues set forth above constituted nonarbitrary reasons.

Finally, Michael suggests that "two influential factors" in the court's decision were that Michael's mother had not pursued counseling and Dr. Flinton had not performed a polygraph test on Michael. While these issues were briefly mentioned at the dispositional hearing, nothing in the record suggests they formed the basis for the court's decision, as Michael would have us believe.

## DISPOSITION

The disposition order is affirmed.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Brick, J.[*]

_____

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.